First case for argument this morning is 19-1385, Kaquelin v. United States. Ms. Krantz, whenever you're ready. May it please the Court. My name is Erica Krantz. I represent the United States in this case, and with me is Edward Thomas, also from the Justice Department. This is not the kind of Trails Act case that this Court usually sees. Usually you have a rail corridor that's actually been converted to a public trail, triggering Section 8D of the Trails Act. But in this case, there was no trail conversion. There was just a need to. And that's a regulatory notice by the Service Transportation Board that indicates that the railroad and a would-be trail sponsor are interested in negotiating about possible trail conversion. But because those negotiations failed, there was no trail conversion, no issuance of the, or the effect of the NITU as of July 5th preclude end of the easement for the 180 days? No, because first, the railroad has a perpetual easement on this land. It is not required to abandon its... Did it preclude the railroad, if the railroad had wanted to on July 6th, from abandoning it and having the easement end? The railroad could not consummate... I didn't think this was a disputed point. No, I just want to be clear. I think there's a, there's an error in the premise of your question. The railroad, the NITU did prevent the railroad from consummating abandonment during the term of the NITU. However, the railroad voluntarily entered into the NITU. So the railroad, by saying, yes, I will negotiate, that meant the railroad was affirmatively indicating it was not prepared to consummate abandonment at that point. The railroad did not have to consummate abandonment at any point. The fact that the railroad had initially... Is there any indication that it would not have consummated abandonment in the absence of the NITU? The railroad agreed to the NITU. In the absence of a NITU, can we assume, without, if there's no other indication in the record, that the railroad would have been free to abandon it during that period of time? It would have been free to, but there was no requirement that it do so, and indeed sometimes railroads change their mind and don't consummate abandonment. What do you mean change their mind? The railroad was free in the absence of the NITU to consummate abandonment during the period that was otherwise now covered by the NITU. Is that right? It would have been, yes. So maybe, but we don't know anything more than that. That's right. We don't know if the railroad would have consummated at some point during the NITU. In other words, earlier. We don't know if it would have done so on the exact same date that it did do so. We don't know if perhaps something else would have happened. There are plenty of these cases where the railroad initiates abandonment proceedings, means it obtains permission to abandon, but then it does not do so. Or sometimes the railroad seeks extensions of time to consummate abandonment. So for instance, there are another handful of cases where a NITU was in place for one year, trail negotiations failed, and then the railroad sought several extensions of time to consummate abandonment before it did ultimately do so. In that case, how could the NITU have extended the time of the railroad's abandonment when the railroad otherwise sought an extension of time for that abandonment? That is entirely the railroad's right. But in this case, there was no request for an extension. And I guess the question that's troubling me, and perhaps my colleagues, is that to what extent did the presence of the NITU cause any delay in what would have otherwise happened in the normal abandonment process? It is not clear that it caused any delay whatsoever. And how can there be a taking? There cannot be a taking. That's why we're here, because we think this result is absolutely incorrect. Well, we don't know. I mean, the bottom line is we don't know. I mean, there might be instances where we've got the railroad just sending everybody a letter and saying, hey, I'm not really planning to do this unless I'm forced till some time in the future. Or alternatively, we could have the railroad sending a letter like, in the absence of an NITU, I would have banned this on day one. But again, we don't know, right? I mean, we don't know. The railroad can always decline the need to. It doesn't have to negotiate. So the railroad has invited this extension of its abandonment deadline, if you will, just the same way it can always seek an extension of time to abandonment. If it had, without this whole rails-to-trails process decided on its own, we sure would love it, love this to be a trail. That wouldn't have stopped the effect of, under Iowa law, of abandonment and return of the easement where what it wanted to do was wholly outside the purpose of the right-of-way granted by condemnation. But that's a trail conversion hypothetical. That's Purcell, right? And we're not asking you to change the law when there's actually a trail conversion. I'm just focusing on your repetition of the idea that the railroad invited this. So it invited, in the absence of the rails-to-trails program, would have been irrelevant under Iowa law. We would like somebody else to have this, even though we're completely done with the rail use. That wouldn't change the return of the full property right under Iowa law. Well, I think actually you've clued into something here that's important, because the railroad saying we would like something to happen does not itself trigger the trail conversion. It wouldn't trigger setting aside the SDP's plenary authority to regulate rail abandonment. It wouldn't trigger the expiration of the easement. It would only be the actual trail conversion, the expansion of the easement, the allowing uses that are inconsistent with the railroad's perpetual use. My understanding is that under the Iowa statute, taking up the actual rails plus, I don't know, I guess, permission to abandon automatically ends the easement. Is that wrong? That is wrong, because the SDP... I said under Iowa law. Right, but our view is that federal law has entirely preempted abandonment of this specific type of railroad easement under state law. So setting aside the Trails Act, if a railroad wants to abandon, even if the rail corridor has been basically not used for several years... The STB on June 5th said it's a go to abandon as of, please don't interrupt me, as of July 5th, except for the possibility that somebody might come in and what happens starting in later June, get this trails process going. That's not correct. What the STB said is railroad, you have permission to consummate abandonment within the next year if you wish. It was not required. Let me state it more precisely. The STB said you have federal authority to abandon but for the process of rail. That plus taking up the rails under Iowa law would have returned, ended the easement. No, I don't believe so. Not until the railroad has consummated abandonment, which means taking all affirmative steps, not just taking up the rails, fulfilling any other conditions that are placed on it, and giving notice to the STB that has consummated abandonment. Can I ask you this question? So I think you agreed, but in any case, I think it's true that, but for the NITU temporarily prohibited an abandonment. That's the kind of situation that in other areas of law, and I think what you're talking about is, well, maybe there was no harm because the railroad wouldn't have abandoned anyway. My general sense, tell me if you have a different view, is that in other areas of law, like inevitable discovery, or independent source in Fourth Amendment, or the two hunter situation in tort law, when the defendant that actually causes something, in the sense of here prohibiting an abandonment for a while, says no harm because it would have occurred anyway, the defendant has the burden of showing that independent thing. Which would mean here, the government would have the burden of getting evidence from the railroad that it would not have abandoned this any time before, what's like January 1st, when the NITU ended. That's right. But there's no such proof. I'm not familiar with those standards that you're referring to. There's this weird absence of evidence on this question. What would the railroad, in fact, have done here? And it seems quite right that if we knew the railroad would not have abandoned, then the prohibition, the federal prohibition on abandonment, starting July 5th, wouldn't have done anything. But we don't know that. Again, the government hasn't prohibited the railroad from doing anything. The railroad invited this. The railroad said, yes, I will. It's the same as any other decision by the railroad to delay its abandonment for any other reason, which it has the complete right to do. Not only does it have a perpetual easement, it can hold onto this basically forever, but it has complete discretion over when to initiate abandonment proceedings and also when to consummate them. And that consummation of abandonment, that is when we, that's the definitive proof that the railroad intended to abandon. But what if, I mean, just following up under Toronto, I guess I'm not clear on what your reaction is to what he was asking about. If we had a letter from the railroad that said, I'm abandoning, I plan to consummate on such and such a date in the absence of an NITU, wouldn't that be sufficient for us to say that, yes, it was the NITU that caused the continuation of this time, of this? Perhaps, then you would have a but for. We certainly don't have that in this case. Whose burden it is to produce it, I don't know. I mean, the plaintiffs certainly haven't produced any evidence. Do you agree that it matters who is the, I mean, that one should decide that question because it could be relevant or dispositive to what we've got before us. I think you've kind of acknowledged that, that yes, if we had evidence one way or the other, it would arguably be dispositive. So you're right. We don't know, I don't know that we've concluded specifically who has the burden, but that's the question, right? I suppose it could be. I still resist the characterization that the government has prevented the railroad from doing something here since, again, the railroad chose to negotiate and the railroad has complete discretion over whether and when to abandon its rail line. I mean, the other part of that is that taking this all the way back to Purcell, remember the blocking of reversionary interest in Purcell, it was the trail conversion. And we don't have that here. We don't have any expanded use. We don't have any entry of third parties here. There's no change in status of the railroad's easement. And so Caldwell is what we think the source of this confusion is, right? So Caldwell was a trail conversion case, but this court set the accrual of that claim at the need to, and we think that that's the problem. Caldwell said the need to was the only government action in this whole scheme that could have caused it taking. Your position in Caldwell, at least before the decision, was that that was not the accrual date? Our position in Caldwell, in this case, in this court, was that the entry of the trail use agreement should be the moment. That's what triggers the statute, and that should be the accrual date for a trail conversion claim. And this court adopted an earlier date. They adopted the need to as the claim accrual date. At the time, we didn't foresee all the problems that that would cause. But there's a couple things. One, the working of the statute is, in effect, a government action that you can tie claim accrual to. And second, since Caldwell, there are new regulations that now require the railroad and the trail sponsor to let the STB know when they've reached a trail use agreement. So you have now this formal notice happening. STB puts it on their website. So there would be notice to the world that rail banking is occurring. So we think it's quite clear that you can change Caldwell and set claim accrual for the trail conversion takings. You can set that at the entry of the trail use agreement. That will clear up, we think, the confusion that led to Ladd that somehow equated the need to, which, again, does not change the use of the easement. And we don't think even extends the easement beyond what the railroad could otherwise do. It equated the need to impermissibly with the physical taking that can be worked by the actual trail conversion. You have urged us to refer this matter to the en banc court to revisit Caldwell and Ladd. That precedent has been around for 16 years. What compelling reason is there for the court to review that? Well, while the precedent, Caldwell has been around for a long time. Ladd has not been around quite so long. And this case actually was the very first one to go to final judgment after Ladd. So Ladd is 10 years. Caldwell is 16 years. It's a long time. That's right. Is there something going on, some circumstance that compels the court to revisit this? Sure. Well, for one thing, in Caldwell, what this court had seen so far was only actual trail conversion claims. We weren't foreseeing that. There were differences. But yet, that's an established precedent that people have been living with for 16 years. The big reason is because we now have a whole bunch of these cases. We have about 50 cases pending right now that raise one or more of these issues. And as the authors... And is that different for what's... Is this something new and suddenly different? I mean, you started to mention this is the first case since Caldwell and Ladd. So now, suddenly, something's happened? That's right. We've had cases that have been affected. And now, in recent times, there are a whole slew of cases? Just as background, in Ladd, we sought re-hearing on Bonk. And one of the authors of Ladd, Judge Moore, said, we think Ladd is an egregious legal error, but it was compelled by Caldwell. That was something we did not foresee. And apparently, at least some judges on this court thought that on Bonk review of Ladd was not appropriate at that moment because we had not also sought to overturn Caldwell. Here we are. This is our first chance to present you with that argument. We're doing it now. This is a constitutional issue. The government should not be required to pay compensation for these phantom physical takings where nothing physical is actually happening. We think it's important to get the legal framework right so that the government doesn't have liability. Can I just ask you, are there cases from the Supreme Court or our court or anybody else who addresses takings that talk about the transfer of a well-recognized legal category of property rights here, an easement, as automatically or not automatically constituting a taking, a compelled imposition of an easement, even if nobody's walking around on it? I'm not sure that there's a Supreme Court case exactly like that. But for instance, cases we've cited like Block v. Hirsch and FCC v. Florida Power Corp., these are cases where there's some kind of government action that's interfering with a relationship between two third parties. So for instance, in Block v. Hirsch, there's a government law that allows tenants to hold over longer than their landlords might prefer. But at least that one, unlike this one, was entirely voluntary, the presence. This one came about by condemnation, right? That's right. But of course, it's changed hands. The plaintiff's predecessors voluntarily acquired land that was burdened by this railroad easement. So I mean, the court has said, we don't like per se tests. We don't like right-line tests. Those should be reserved for the very clear circumstances where there's been a physical government occupation of land. Other than that, you apply a multi-factor test. And that's all we're really asking for here, is that the court, LAD has been taken too far. We don't think LAD actually said quite as much as the CFC has taken it to mean. But the CFC has certainly taken it to mean that these are effectively all per se takings if the plaintiffs can establish their property interests. And we're asking you whether you do it by overturning LAD and or Caldwell, or whether by leaving LAD in place and recognizing that you can harmonize it with the Arkansas game. But the CFC should be applying a multi-factor test here to assess whether there's takings liability in these cases. OK. I see no more time. Thank you. May I please agree, Your Honor? Um, this case and the government's appeals have really been a total fool's errand, both procedurally and substantively. The first issue that they address in great detail is they want this court to conclude that the need to alone does not trigger a physical taking. So they readily admit that they want to overturn Caldwell and LAD. But they, in essence, really need to overturn Caldwell, Barkley, Illig, and LAD at a minimum. And it's actually an assault on all of the rails to trails. Can I just ask you about one question is what legal standard might apply to decide whether the need to is a taking? A different question, I think, is whether in the absence of evidence that the railroad would have left earlier than allowed, that is earlier than the 180 days after July 5th, there just was no caused taking. Let me just ask you about that. Why? First of all, am I right that there's simply no evidence? Nobody asked the railroad what would you have done had you been freed on July 5th? I don't know of anybody asking the railroad that. Who should have the burden? I believe it is a clear-cut, bright-line rule that nobody needs to ask the railroad what they would have done. And the fact of the matter is that in this case, and it is a classic example of the government wants to first ensure that the rail banking or the trail use agreement actually comes to fruition before there's any consideration of what the impact of the need to is. But that's backwards. The Supreme Court has said for 100 years it's not what the government gained, it's what the landowner lost. And I think this question that you're asking, Judge Toronto, is... It seems to me my question does go to what the landowner lost. If the railway had come in with a declaration that said it's going to take us 181 days to remove the rails, and it's only on day 182 that we will... I'm not sure what the word consummation means. That we will announce to the world that we're abandoning or something. Then, not until then, under Iowa law, would there have been an end of the easement. In which case, nothing the government did during that 180 days would have changed the status of the plaintiff. I don't believe that's correct legally, Your Honor. Why not? I don't. It's correct under Iowa law. But the taking here is the statutory preemption or the statutory scheme that takes their land, their right to have their land back during that six months or six years or 10 years or however long it takes. Are we not understanding, or maybe I'm not understanding Judge Toronto's question? Because his circumstance is that the railroad would have retained this through the entire period of the NITU, even in the absence of an NITU. If the landowner is in no different position, they would have not gotten the land back until day 183. Where is the taking? The taking is the statutory intrusion where the federal law preempts the state law property right. I would refer the court to Justice O'Connor's concurring opinion in Preso 1 that deals exactly with this question. It says the federal government has the right to intervene, but the intervention that preempts the state law reversionary right is the taking. Okay? And it doesn't matter whether it is delayed six months or a year or five years or 10 years. That's the taking, is because it preempts their state law reversionary right. The word delayed, but we don't know under the scenario where, under the hypothetical, where the railroad has declared that it's not going to move aside until a certain date, then where is the delay? Maybe that's the issue. What is the delay if it wouldn't have reverted back to the property owner in any event? It would have reverted back to them, but for, and there's no telling how long it would have actually taken, but that's not the point. The point is that there is a bright line rule established by this court. But you just said it would have reverted back to them, but for, but the situation, the hypothetical, forget what state law is, the hypothetical is the railroad's telling us that they're not giving up, they're not consummating the abandonment until January 1st, 2020. So in any event, the NITU is completed before that, runs its course before that. Do you understand? I mean, I'm not sure I am, but what is causing the delay? The delay is caused by the issuance of the Notice of Interim Trailing. What if the delay would have been, it would have existed in any event, because we have clear evidence, uncontroverted evidence, that the railroad was not going to abandon until January 2020 in any event, even in the absence of the NITU. Do you understand? I do understand the question. So the landowner, the original landowner, is in the exact same position, whether or not the NITU occurs or doesn't. Is that still a taking in your view? Yes, it is under this court's precedent, because under Preso 2, Caldwell, Barkley, Illig, Ladd, the issuance of the Need-To triggers the taking. That's number one under all of those cases. Number two, all of those cases stand for the proposition that it does not matter what happens thereafter, including the ultimate negotiation of a trail use agreement. Anything that happens thereafter is irrelevant. You can't have a taking based on the acts of third parties. The issuance of the NITU, private parties who are ultimately negotiating a trail use agreement, Caldwell, Barkley, Illig, Ladd, they all stand for the proposition that the only governmental act is the NITU. And the fact of the matter is, is all of those cases stand for the proposition that it is a physical, categorical taking at the time the NITU is issued, whether it is ultimately temporary or becomes permanent. That's what all of those cases say. It is a bright line rule. What is taken? The taking is there. If there's no, you know, under our circumstances, there's no consummated rail-to-trail agreement. And there's no evidence that the issuance of the NITU caused any delay whatsoever in what would have otherwise occurred with the railroads abandonment. What is it that the government is taking? It blocked the landowners' reversionary right. It blocked it for a period of six months in this case. But the reversionary right was already blocked just because of the normal mechanism of abandonment. Factually, perhaps yes, but legally, no. Because the reality was, is the railroad petitioned the Surface Transportation Board for permission to abandon. They had already said that we want to abandon this. All the conditions for abandonment had already been met. And so the federal statutory intrusion into that state right, state law property right, is exactly what caused the blockage of those reversionary rights. So can I just return to, I think, a question I discussed earlier. It seems to me that what you just said might support, let's just assume it supports a notion that the government's action in legally precluding an abandonment is prima facie a cause of the harm, which is the delay in, which is delay, not the delay, delay in end of the easement. But that there might well be a proof that it would not have occurred anyway. And this comes up in all kinds of causation situations. I mentioned a couple of Fourth Amendment ones, that tort law, the two hunters, all kinds of things. But particularly if the defendant, as here, is responsible for preventing the action of the other causer, the defendant, as far as I can tell, nearly always has the burden of showing that, which didn't happen here. But I don't see how you get beyond that to say what I think you're saying, that is, even if the railroad said we would not abandon until, whenever they did here, I think March 31st, 2014. Nevertheless, the action of the government, as of July 5th, 2013, in creating the 180-day delay, took something that your client otherwise would have had, when your client would not otherwise have had it. I think that, I think you're right with respect to the examples you gave, that the burden would be on the defendant in that instance.  Asking the court to develop, or authorize, is the whole concept of two different takings from the same governmental act. They're wanting the court to analyze this under a potential multi-factor test after the need to is issued, until the trail use agreement is reached, which is exactly what Judge Leto did in this particular case, under directions from the court, and called it a very atypical task. The fact of the matter is, is they want that to be viewed as a temporary regulatory taking, which then would require a multi-factor test, and then it mysteriously becomes a permanent categorical taking when the trail use agreement is reached. This court, specifically in Barclay, called that result bizarre, and said that can't happen. And they cited the Supreme Court case of Dow that says you can't have two takings from the same governmental act. That's what they're wanting this court to do. But do you agree, when we started this little colloquy with Judge Taranto, that arguably the defendant bears the burden, but that suggests if you agree with that, then there is evidence that could dislodge your theory, i.e. if the railroad here had provided an affidavit or declaration that said that they're not going to consummate the abandonment until after the expiration of the NITU, in any event, even if the NITU was never issued, they were not going to abandon a certain... I assume you've agreed with Judge Taranto that the defendant has the burden to show that, but if that can be shown, then there's not a taking. I agree with the concept in those other examples. He gave that burden would fall on the defendant. I don't know that those are bright-line rules like this court has established in Caldwell, Barclay, and Illig, and Ladd. This court in Ladd specifically said that. We specifically reject the whole concept that this is merely a temporary regulatory hold. And that would have to be reversed. Barclay would have to be reversed on the whole concept of two takings because you can't have multiple takings from the same governmental action. And in fact, in Preso 2, this court... If the railway would definitively, just assume, not have abandoned during the 180 days, there wouldn't be two takings. There wouldn't have been a taking during that period. And so if there came to be an agreement that essentially indefinitely precluded abandon because it was a rail agreement, then there would be one taking, then and then only. There would be a taking that starts when the need to is issued. And the length or duration of that taking could be based on a number of facts that we don't know and we will never know depending on the case. Here, we don't know what the railroad would have done or would not have done. And it's irrelevant to the Bright Line Rule. Does that strike you as strange in this case that we don't know that? No, it doesn't because that's the exact holding in Preso 2, Caldwell, Barclay, Illig, and Ladd. And the fact of the matter is, is if you change that Bright Line Rule, you would have chaos and uncertainty. And in fact, this court in Barclay specifically said, you can't change this Bright Line Rule because then you would have chaos and uncertainty. And it's the parade of- Can you elaborate on that a little bit? Yes, sure. There's one railroad, let's assume they have a telephone. What's the problem in at least trying to get, obviously, there have to be depositions and whatnot, but why chaos and uncertainty? Well, if the court changes the Bright Line Rule and says the issuance of a NITU does not trigger a categorical physical taking, whether it's either temporary or permanent, then you're right that at that point in time, there wouldn't be any taking. But that requires the reversal of all of these cases that this court has actually- Maybe I'm not hearing what's been said, but I didn't understand that to be this discussion here. Not under any circumstances will the NITU not constitute a per se temporary taking. But in the circumstance where the record is clear and uncontroverted, that the railroad would have retained all of its rights during the period of time we're speaking of, then that would not constitute- The NITU would not be a taking. So that's- If we all know that with some certainty at some early time, the question is, where's the uncertainty and the chaos? I must not be understanding the question, Your Honor. If the railroad would come in and say, this is not about the railroad at all. The railroad has already said that. They have met all the conditions for abandonment, and they want to abandon the railroad corridor. At a time certain? Yeah, well, they said that when they filed their notice of exemption with the STB, that's what they declare to the STB. And don't they have a year? Isn't that- They have a year to consummate abandonment once the railroad actually issues the notice of interim trail use. But that is many times extended on indefinitely for four years, six years. If there had not been a NITU, am I wrong? I thought I had understood that the June 5th STB approval, which would permit the abandonment as of July 5th, that under the regulations or statute, they have a year from that date to abandon. And if they don't do it, then they have to come back and apply again to the STB. Correct. Okay. If there was no NITU in this case, there would be no taking. That's what triggers it. Because that's the intervention, that's the federal law, the Trails Act intervening in the state law to preempt these landowners' reversionary rights. That's what this court has held all the way back from 1996 when Preso 2 was adopted en banc. And this exact issue is the opposite issue that the government has always taken in the past. And this issue has actually been presented to this court and rejected by five panels of this court, where they tried to say that the NITU does not trigger a temporary or permanent categorical physical taking when it's issued. And I do want to say, I know my time is up, but I want to say one word about Arkansas Game. Because the whole premise of this is the only way this panel can disturb earlier precedent is to find that Arkansas Game somehow is intervening law. Okay. Or I suppose send it en banc and see if en banc, they want to reverse all of this precedent since 1996. But the fact of the matter is, is that what the government is wanting you to believe is that a multi-factor test has to be applied anytime the taking is temporary in nature. And that's just not the case. There are a number of cases that we cite in our brief from the Supreme Court. Judge Leto cited all of them. He went through a detailed analysis of all the different categories of takings. And his opinion is well reasoned and followed the controlling precedent of this court. And we're actually very fortunate that Judge Leto was the judge in Arkansas Game. He was also the judge in this case. And this roadmap that he's written is fantastic. And it cites a number of cases where there have been temporary categorical physical takings and a multi-factor test has not been applied. And the reverse of that is that a multi-factor test has never been applied to a temporary categorical physical taking. There is not one example. In fact, during the closing argument in this case, Judge Leto asked the government's attorney three different times, can you name one case where a categorical physical taking resulted in the application of a multi-factor test and the government could not? And I want to say one last word about it. If there's any controlling precedent from the Supreme Court post Ladd, it's actually the Nick case that we filed as supplemental authority where Justice Roberts just recently said that the taking occurs when the taking is triggered, in this case when the need to is issued, and that a temporary taking is still a taking. In other words, a bank robber can rob a bank and later return the money, but he's still guilty of robbing the bank. Thank you, Your Honor. Thank you. Will we start several minutes of rebuttal? Sorry to do this, but can I ask you a question? Of course. Do you think that Caldwell or Ladd or Barclay or any of those cases would need to be overruled to say that there would be no taking if there were proof that there would not have been a railway abandonment during the 180 days?  Because I don't think that there would be Well, the CFC has taken Ladd to say that a need to is definitively a taking. This Court clarified in Ladd 2 that the first decision in Ladd did not actually definitively say that, that there were other sort of preliminary questions that needed to be answered and that could be one of the preliminary questions. Okay, one other question. Which I should have asked you about before. In the fairly recent, is it Campbell decision? There is a discussion, a paragraph discussing a 1964 Court of Claims case, Cuban something or other, which you put together two little pieces of it and as Campbell said, said that once you have identified a piece of property and the government freezes its transfer, freeze I think is the word, that moment there is a taking. Why is this not like that? I'm sorry, I'm not specifically familiar. This is post-World War II. There are a gazillion military trucks in Germany. The U.S. government gets together with German authorities and says a lot of people around the world would like to buy them. Somebody buys one, let's take out the German government at this point because the case did and the government says freeze everything and some of those trucks had already been purchased, takes a month or two and then this truck or these trucks are identified and the question is when did the taking occur? And the Court of Claims says the freeze, once it has been made applicable to identified trucks, that is a taking as usual because of a statute of limitations question. Why should this not be like that? This is the freeze of the transfer back of the easement. Well, part of the problem is because one of the differences, I guess, is the type of interest that the railroad has. The railroad interest is not set to expire at any particular time. It's perpetual easement. The railroad agrees to the need to. So this sort of gets to your causation question also to both me and my friend. The only evidence we have in the record is that the railroad did not intend to abandon. During the need to period, the railroad agreed to the need to. Need to would not have been issued, but for that agreement on this record, we then have the railroad indicating no intent to abandon any sooner than at least the end of the need to. This is getting off a little bit, but I just want to emphasize just how many different possible outcomes a need to can have. We have now about 10 cases where there was a need to that expired and then a railroad elected not to consummate abandonment is instead held on to the rail easement. It's still a rail easement only. It hasn't been converted. It's still within STB jurisdiction and that's perfectly fine. That is perfectly permissible under proper law and under the railroad's perpetual rail easement. I want to turn to something that counsel said several times during his argument, which is that the statute works at taking in this case and that Purseau and all these other cases say the statute works at taking upon the need to. The statute was not triggered here. Section 80 is triggered when a trail use agreement is entered, which allows interim trail use. That is when the easement is prevented from expiring. In Purseau, there was a trail conversion. Also in Purseau, there was no need to. That just highlights that it's not the need to doing any of this. It is the trail conversion upon the trail use agreement that triggers the statute. We're not asking this court to touch Purseau. We are not asking it to go back to 1996. It's completely wrong. As far back as we're looking is Caldwell. We think Caldwell is where this error started. I, oh, sorry. I want to say one more thing about causation. I said this earlier about burden. St. Bernard Parish from this court says that it's the plaintiff's burden to show what would have happened in the absence of the complaint of government action. On this record, what would have happened is exactly the same as what did happen. A railroad voluntarily exercised its discretion to abandon on its own timeline. The landowner didn't lose anything. Her interest was at all times just a possible future interest that was wholly contingent on the railroad's decision, the railroad's timeline for abandonment. We're asking you to correct Latin Caldwell to return to a framework that correctly reflects the way the Trails Act works, the way the implementing regulations work, and how this court in Purseau said they could work with taking. Thank you. We thank both sides and the case is submitted.